UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

ROBERT WILLIAM DOWNS, II,

Petitioner,

v.

NETHANJAH BREITENBACH,[1]

Respondent.

Case No. 3:22-cv-00075-ART-CLB

**MERITS ORDER**

**[ECF No. 29]**

Petitioner Robert William Downs, II, a Nevada prisoner, has filed a counseled First-Amended § 2254 Petition, alleging various ineffective assistance of trial counsel claims. (ECF No. 29 ("First-Amended Petition").) Respondents answered the First-Amended Petition, and Downs replied. (ECF Nos. 57, 68.) For the reasons discussed below, the Court denies the First-Amended Petition.

## I. BACKGROUND

### A. Factual background[2]

Lindsay Phillips, who worked as the property manager at the MacGregor Inn, a weekly motel in Reno, Nevada, testified that three of her tenants filed noise complaints, stating that they heard banging, crying, and yelling coming from Downs's room. (ECF No. 31-9 at 291–92, 306, 308–09.) Allison Alamo and her son, N.B., who was seven years old at the time, had started living with Downs at

[1] The state corrections department's inmate locator page indicates that Downs is incarcerated at Lovelock Correctional Center. Nethanjah Breitenbach is the current warden for that facility. At the end of this Order, the Court kindly requests the Clerk of Court to substitute Nethanjah Breitenbach for Respondent State of Nevada. *See* Fed. R. Civ. P. 25(d).

[2] The Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. The Court's summary is merely a backdrop to its consideration of the issues presented in the First-Amended Petition.

the motel before the noise complaints began. (*Id.* at 310–11.) On May 16, 2013, a few months after Alamo and N.B. moved in, Downs took N.B. with him to Phillips's office to discuss his rent (*Id.* at 311.) At that time, Phillips saw that N.B.'s "eyes were all bloody red," he had bruises on his wrists, and he "had a big bruise on the right side of his eye." (*Id.* at 314–15.) When Phillips questioned Downs about N.B.'s appearance, Downs said that he may have knocked N.B. while they were sleeping and that N.B. eyes were the result of coughing fits. (*Id.* at 315.)

Diane Crowley, another tenant at the motel, testified that N.B. was thin, frail, and had bruises on his legs. (ECF No. 31-9 at 328, 332.) Crowley filed a noise complaint against Downs because she heard a child screaming in his room. (*Id.* at 333.) On May 15, 2013, Crowley heard "Mr. Downs screaming at [N.B.], 'You nasty little fucker. You're eating your diapers.'" (*Id.*)

Detective Scott Johnson with the Reno Police Department testified that he conducted a welfare check on N.B. on May 16, 2013, and that N.B. had "bloodshot eyes where the white of his eyes was not present at all," was very thin, and had bruises on his face. (ECF No. 31-9 at 341, 345–46.) Detective Johnson asked to speak with N.B. alone and asked him to remove his shirt and pants to check for other injuries. (ECF No. 31-10 at 13.) N.B. "had various injuries all over his body" and was wearing a diaper. (*Id.*) Detective Johnson canvassed some of the other tenants of the motel and got "reports of an animal being tortured in that room." (*Id.* at 32.)

Ryan Boren, a social worker with the Washoe County Department of Social Services, testified that she took N.B. into protective custody. (ECF No. 31-10 at 36–37, 54.) After her investigation was concluded, Boren determined "that child abuse had occurred" and "internally substantiated Mr. Downs" as the cause of that abuse. (*Id.* at 54.)

Detective Zachary Doser of the Reno Police Department testified that he

interviewed Downs on two occasions. (ECF No. 31-10 at 68, 74.) Detective Doser learned that Downs brought Alamo and N.B. from California to Reno in the middle of March 2013. (*Id.* at 78.) Downs explained N.B.'s eye injuries to him as follows: N.B. "climbed into bed with him and [Downs] is a violent sleeper and accidentally elbowed him in the eye." (*Id.* at 81–82.) Downs also stated that N.B. was clumsy and would fall down a lot and that the two of them would roughhouse. (*Id.* at 82.) During Downs's "first interview he kind of downplay[ed] his alcohol use and then during the second interview . . . he[ ] talk[ed] about blackout rages." (*Id.* at 95.)

Detective Doser also interviewed N.B., who stated that Downs would choke him until he lost his vision and would put a cloth in his mouth, wrap an ACE bandage around his head, bound his hands and feet with a cord, and then put him in a bathtub full of water. (ECF No. 31-10 at 106, 108–09.) Detective Ashley Harms of the Reno Police Department also interviewed N.B., and N.B. told her that Downs would punch him with a closed fist. (ECF No. 31-11 at 114, 128.) Similarly, N.B. testified that Downs would choke him, make him hold soda cans in both hands with his arm out, and hold his head under water in the bathtub after binding his hands and feet together and putting a cloth in his mouth. (ECF No. 31-11 at 56, 64–66, 71.)

Dr. Catherine Wagoner evaluated N.B. on behalf of Washoe County Child Protective Services. (ECF No. 31-10 at 164, 170–71.) Dr. Wagoner testified that "one of [her] biggest concerns" was N.B.'s "bruising pattern, especially the scalp and facial injuries" and "[t]he bilateral feet bruises and the bilateral thigh bruises" because those "don't have an explanation in natural childhood activities." (*Id.* at 200.) Dr. Wagoner was also concerned with N.B.'s "overall neglect," including the fact that N.B. had been "starved for the last three to five days" prior to his examination. (*Id.* at 200–01; ECF No. 31-11 at 46–47.) Dr. Wagoner testified that strangulation or "inflicted water immersion such that the child can't breathe" could explain the appearance of N.B.'s eyes, which she diagnosed as bilateral

extensive subconjunctival hemorrhage. (ECF No. 31-10 at 203–04; ECF No. 31-11 at 33.) In sum, Dr. Wagoner concluded that N.B. "was, in fact, a victim of abuse and neglect in his environment." (ECF No. 31-10 at 207.)

Andrew Bowser, a Mental Health Counselor with the State of Nevada Early Childhood Mental Health Services, treated A.B. once a week for a year following his removal. (ECF No. 31-11 at 158–160, 164.) Bowser diagnosed N.B. with reactive attachment disorder and PTSD and testified that N.B. suffered emotional impairment due to the abuse he suffered. (*Id.* at 170, 186.)

Tara Godoy, a forensic nurse, testified for the defense. (ECF No. 31-11 at 188–89.) Godoy reviewed N.B.'s medical records, photographs of N.B., and police reports in this matter. (*Id.* at 189.) Godoy testified that (1) "there's a broad range of potential causes for . . . subconjunctival hemorrhages," (2) based on the photographs of N.B.'s body, she would "not necessarily" be "suspicious of abuse taking place," (3) the doctors at the hospital "failed to rule out more serious diseases," including "hand, foot and mouth, pertussis, and medication reactions," and (4) N.B.'s "bruises are not highly suspicious for abuse and most are in locations that are consistent with normal or hyperactive play of a seven-year-old boy with ADHD." (*Id.* at 192, 196, 204–05.)

**B. Procedural background**

A jury found Downs guilty of first-degree kidnapping and three counts of child abuse resulting in substantial bodily harm. (ECF No. 31-21 at 13–14.) Downs was sentenced to three concurrent terms of 96 to 240 months in prison for his child abuse convictions to run consecutive to his sentence of life with the possibility of parole after 5 years for his first-degree kidnapping conviction.[3] (ECF No. 31-34.) Downs's judgment of conviction was entered on November 17, 2015.

---

[3] It appears that Downs has been paroled from his kidnapping conviction and started serving his concurrent child abuse sentences on May 2, 2024. Downs's projected prison expiration date is August 29, 2034.

(*Id.*) Downs appealed, and the Nevada Supreme Court affirmed on June 28, 2017. (ECF No. 32-8.)

Downs filed his *pro se* state post-conviction habeas petition on June 4, 2018. (ECF No. 32-17.) Following the appointment of counsel, the state court denied Downs post-conviction relief on March 23, 2020. (ECF No. 32-42.) Downs appealed, and the Nevada Supreme Court affirmed on November 10, 2021. (ECF No. 33-21.) Remittitur issued on January 7, 2022. (ECF No. 33-24.)

In his First-Amended Petition, Downs presents the following grounds for relief:

1. There was insufficient evidence to support his first-degree kidnapping conviction.
2. His trial counsel was ineffective for failing to challenge the sufficiency of the evidence on the first-degree kidnapping charge.
3. His trial counsel was ineffective for failing to ask the trial court for a jury instruction informing the jury that to convict him of both first-degree kidnapping and child abuse, the State had to show that the movement of the child required for the kidnapping charge was not incidental to the related child abuse charge.
4. His trial counsel was ineffective for failing to object to erroneous instructions on child abuse.
5. His trial counsel was ineffective for failing to object to Detective Doser's testimony, commenting on his credibility and expressing quasi-medical opinions about the causes of the victim's injuries.
6. His trial counsel was ineffective for permitting the victim to testify via Skype and for failing to effectively cross-examine the victim.

7a. His trial counsel was ineffective for failing to file a motion in limine or object to the State's use of certain photographs.
7b. His trial counsel was ineffective for failing to interview and call certain witnesses for trial.
7c. His trial counsel was ineffective for failing to retain specific experts.
7d. His trial counsel was ineffective for failing to test items for DNA.
7e. His trial counsel was ineffective for failing to investigate and present a defense that his co-defendant was responsible for the victim's injuries and that his conduct did not amount to abuse.

8. His trial counsel was ineffective during plea negotiations.
9. His trial counsel was ineffective for failing to move to suppress statements that he made to Detective Doser and object to admitting the video recordings of this questioning at trial.

(ECF No. 29.) Respondent moved to dismiss Downs's First-Amended Petition. (ECF No. 36.) Downs opposed the motion, and Respondents replied. (ECF Nos. 46, 49.) The Court granted the motion, in part, and denied it, in part, as follows: (1) it dismissed grounds 1, 2, 3, 4, and 6 as untimely, and (2) it founds grounds 5, 7, 8, and 9 to be technically exhausted and procedurally defaulted but deferred consideration of whether Downs can demonstrate cause and prejudice to overcome the procedural default of these grounds until after the filing of an answer and reply. (ECF No. 50.) Respondents filed their answer to the remaining grounds—grounds 5, 7a, 7b, 7c, 7d, 7e, 8, and 9—on May 27, 2025. (ECF No. 57.) Downs replied on March 10, 2026. (ECF No. 68.)

## II. GOVERNING STANDARDS OF REVIEW

### A. *Strickland v. Washington*

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

### B. *Martinez v. Ryan*

The Court previously determined that the remaining grounds for relief—grounds 5, 7a, 7b, 7c, 7d, 7e, 8, and 9—were technically exhausted and procedurally defaulted. (ECF No. 50 at 5.) The Court then deferred a decision on whether Downs can demonstrate cause and prejudice to overcome these procedural defaults until after the parties filed an answer and reply brief on the merits. (*Id.*)

A petitioner can demonstrate cause to overcome the procedural default of a claim of ineffective assistance of trial counsel by demonstrating either that he had no counsel during the state post-conviction proceedings or that such counsel was ineffective. *Martinez v. Ryan*, 566 U.S. 1, 14 (2012). To demonstrate prejudice, a petitioner must show that the defaulted claim of ineffective assistance of trial counsel is a substantial claim, meaning the claim has "some merit." *Id.* This standard does not require a showing that the claim will succeed, but instead only that its proper disposition could be debated among reasonable jurists. *See Miller-El v. Cockrell*, 537 US. 322, 336–38 (2003). Accordingly, the issues before the Court are: (1) whether these grounds are substantial; (2) if so, whether Downs's state post-conviction counsel was ineffective in raising these grounds before the state courts; and (3) if so, whether, on the merits, Downs was denied effective assistance of trial counsel. *See, e.g., Atwood v. Ryan*, 870 F.3d 1033, 1059–60 (9th Cir. 2017); *Detrich v. Ryan*, 740 F.3d 1237, 1243–46 (9th Cir. 2013). On all such issues, the Court's review is de novo. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019); *Atwood*, 870 F.3d at 1060 n.22.

## III. DISCUSSION

### A. Ground 5—failure to object to testimony

In ground 5, Downs alleges that his trial counsel failed to object to Detective Doser's testimony commenting on his credibility and expressing quasi-medical opinions about the causes of N.B.'s injuries. (ECF No. 29 at 18.)

Detective Doser testified that N.B. "described being choked . . . [a]nd he made the statement, 'I'm choked until I lose my vision.'" (ECF No. 31-10 at 109.) Detective Doser then stated: "I mean, I understand how that could happen. It's your carotid arteries around the neck area, squeeze in on them, and you certainly do lose your vision." (*Id.*) Detective Doser later testified that he "believe[d N.B.'s] carotid arteries were pushed together and [N.B.] had his vision blacked out" and that "what [he] know[s] of these type of injuries, it's from a lack of oxygen, either being submersed in water until you nearly drown or, in fact, . . . actual[ly being] drown[ed]." (*Id.* at 159–60.)

Nevada law defines an expert witness as someone having "scientific, technical or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Nev. Rev. Stat. § 50.275. Contrarily, a lay witness may testify to "opinions or inferences" that are "[r]ationally based on the perception of the witness; and . . . [h]elpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." Nev. Rev. Stat. § 50.265. According to Nevada law, "[t]he key to determining whether testimony about information . . . constitutes lay or expert testimony lies with a careful consideration of the substance of the testimony," namely, "does the testimony concern information within the common knowledge of or capable of perception by the average layperson or does it require some specialized knowledge or skill beyond the realm of everyday experience?" *Burnside v. State*, 352 P.3d 627, 636 (Nev. 2015).

Detective Doser's testimony that squeezing the carotid arteries around the neck can result in the loss of vision amounts to expert testimony under Nevada law given that it deals with "scientific, technical or other specialized knowledge." Nev. Rev. Stat. § 50.275. Thus, Downs's trial counsel had a sound basis to make an objection. Therefore, the Court determines that ground 5 is substantial and turns to whether Downs's state post-conviction counsel was ineffective.

Downs's appellate counsel raised a similar claim on direct appeal, arguing that "the district court erred in allowing Detective Zachary Doser to testify that the child lost his vision because of pressure put on his carotid arteries, and the hemorrhaging in the child's eyes was caused by a lack of oxygen from attempted drowning." (ECF No. 32-8 at 9.) The Nevada Supreme Court "conclude[d] that Doser improperly provided an expert medical opinion regarding the effects of strangulation and drowning." (*Id.* at 10.) However, the Nevada Supreme Court "conclude[d] that any error resulting from Doser's testimony did not prejudice Downs in light of the overwhelming evidence that he strangled and attempted to drown the child." (*Id.*) This conclusion was based on the following evidence: "(1) the child's testimony that Downs would hold his head underwater and choke him against the wall; (2) Dr. Wagoner's testimony that the child's injuries were consistent with the effects of asphyxiation or strangulation; and (3) items recovered from Downs' motel room that corroborates the child's statements of being tied up and gagged before his head was held underwater." (*Id.*)

Given that the Nevada Supreme Court had already determined that Downs did not suffer prejudice from Detective Doser's improper expert testimony, Downs's state post-conviction counsel exercised reasoned professional judgment in deciding not to raise ground 5 during Downs's state habeas proceedings. Downs's state post-conviction counsel would have been tasked with proving that Downs suffered prejudice under *Strickland* due to his trial counsel's lack of objection to Detective Doser's testimony. Because this very issue had already been decided by Nevada's highest court, it would have been futile to raise this issue again. *See Clem v. State*, 81 P.3d 521 (Nev. 2003) ("The law of the case doctrine holds that the law of a first appeal is the law of the case on all subsequent appeals in which the facts are substantially the same.").

Because Downs fails to demonstrate cause to overcome the procedural default of ground 5, it is dismissed.

**B. Ground 7a—failure to file a motion regarding photographs**

In Ground 7a, Downs alleges that his trial counsel failed to file a motion in limine or to object to the State's use of certain photographs. (ECF No. 29 at 22.)

At trial, thirty photographs of N.B. were presented to the jury. (*See* ECF Nos. 31-9 at 4, 31-10 at 5-6.) Copies of these photographs have not been provided to the Court. Nonetheless, the parties do not dispute what is depicted in these photographs: N.B.'s injuries, including his bruises and bloodshot eyes, as they appeared on May 16, 2013.

Under Nevada Law, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Nev. Rev. Stat. § 48.015. Relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury." Nev. Rev. Stat. § 48.035(1). The Nevada Supreme Court has held that "even gruesome photographs are admissible if they aid in ascertaining the truth, and that despite gruesomeness, photographic evidence has been held admissible when . . . utilized to show the cause of death and when it reflects the severity of wounds and the manner of their infliction." *Castillo v. State*, 956 P.2d 103, 108 (Nev. 1998) (internal quotation marks omitted).

Downs argues that Dr. Wagoner testified about the injuries she observed on N.B., negating a need for the photographs to be admitted. (ECF No. 29 at 22.) The Court disagrees. The photographs of N.B. were admitted for the permissible purpose under Nevada law of assisting Dr. Wagoner in explaining—and the jury in understanding—the circumstances of N.B.'s injuries. *See Ybarra v. State*, 679 P.2d 797, 800 (Nev. 1984) (finding that "[t]he trial court did not abuse its discretion in admitting the photograph" that "would aid a witness, a pathologist, in explaining the cause and circumstances of death"); *Castillo*, 956 P.2d at 108

(holding that, "[i]n light of the considerable discretion afforded the trial court in deciding whether to admit photographic evidence[,] . . . the district court did not abuse its discretion in admitting the autopsy photographs" which "reveal[ed] the extent and severity of [the victim's] injuries"). Indeed, because photographs enhance jurors' perceptions and convey a message more effectively than a verbal description, the Court finds that the photographs were relevant and admissible, negating a basis upon which Downs's trial counsel should have objected.

The Court finds ground 7a to be insubstantial, so, because Downs fails to demonstrate prejudice to overcome the procedural default of ground 7a, it is dismissed.

### C. Ground 7b—failure to interview witnesses

In ground 7b, Downs alleges that his trial counsel failed to interview N.B.'s foster father and the tenants who resided in rooms 229, 119, and 170 of the MacGregor Inn during the relevant time frame. (ECF No. 29 at 22.) According to Downs, the tenant from 229 would have testified that he or she did not hear anything unusual coming from Downs's room despite this tenant working from home; the tenants from 119 would have testified that they would hear the occasionally thump coming from Downs's room but never heard sounds akin to an animal or child being tortured; the tenant from 170 would have testified that he had known Downs for 15 years and that N.B. abused himself, had extremely adverse reactions to bathing, was clumsy, had delusions, and would urinate on himself; and N.B.'s foster father would have testified that N.B. was clumsy. (*Id.* at 22–23.)

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Additionally, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference

to counsel's judgments." *Id.* This investigatory duty includes investigating the defendant's "most important defense." *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994). It also includes investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999). In assessing counsel's investigation, the Court must conduct an objective review of counsel's performance, measured for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.

It is unclear if Downs's trial counsel had justification for choosing not to investigate and develop the testimonies of the other motel tenants and N.B.'s foster father. Given that the prosecution presented tenants of the motel to testify about the noises they heard coming from Downs's room, it would have been sensible for Downs's trial counsel to have presented the testimonies of other tenants who heard no such noises. *See Rios v. Rocha*, 299 F.3d 796, 808 (9th Cir. 2002) (holding that trial counsel's "failure, in a first-degree murder trial, to interview more than one witness, when there were dozens of potential eyewitnesses available, before deciding to abandon a potentially meritorious defense constituted constitutionally deficient performance"). Nonetheless, the Court must "strongly presume[ ]" that Downs's trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *see also Richter*, 562 U.S. at 105 ("Even under *de novo* review, the standard for judging counsel's representation is a most deferential one."). In fact, "[f]ew decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial." *Lord v. Wood*, 184 F.3d 1083, 1095 (1999).

Regardless of Downs's trial counsel's alleged deficiencies in this regard, Downs fails to demonstrate that these witnesses' testimonies would have raised a reasonable doubt in the minds of the jurors as to his guilt. Downs's witnesses

would have testified that they did not hear strange noises coming from Downs's room and that N.B. abused himself and was clumsy. However, these circumstantial testimonies fail to rise to the level of undermining the prosecution's case or undermining confidence in the jury's verdict. N.B. testified about the abuse he suffered at the hands of Downs, and Dr. Wagoner testified that N.B.'s injuries were consistent with that abuse. While the testimonies of the other motel tenants and N.B.'s foster father—if believed by the jury—may have cast doubt on the prosecution's case, they would not have definitively disproven N.B.'s testimony given that none of these witnesses were present in the motel room. Further, a petitioner's attempt to discredit a victim with suppositions rather than direct evidence must fail given that the Court is not able to reweigh credibility. *See, e.g., Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about . . . credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). As such, it is mere speculation that the inconclusive and conjectural evidence of these peripheral witnesses would have changed the result of Downs's trial. *Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation.").

Because Downs fails to demonstrate prejudice under *Strickland*, ground 7b is not substantial. Downs fails to demonstrate prejudice to overcome the procedural default of ground 7b, so it is dismissed.

**D. Ground 7c—failure to retain experts**

In ground 7c, Downs alleges that his trial counsel failed to retain specific experts. (ECF No. 29 at 23.) Specifically, Downs argues that his trial counsel should have retained an expert who could have testified about attention deficit and hyperactivity disorder in children N.B.'s age and how this disorder would explain certain behaviors of N.B., like losing track of time and urinating on himself or being hyperactive and incurring more bruises. (*Id.* at 23–24.)

Downs's argument here is conclusory, as he fails to demonstrate that such an expert existed, such an expert would have agreed to testify on his behalf, or that such an expert would have testified favorably for the defense. *See Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (denying habeas relief because the petitioner's "conclusory allegations did not meet the specificity requirement"); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

Because Downs's claim here is not substantial, the Court finds that Downs fails to demonstrate prejudice to overcome the procedural default of ground 7c and dismisses it.

**E. Ground 7d—failure to test items for DNA**

In ground 7d, Downs alleges that his trial counsel failed to test the items purportedly used to bind and gag N.B. for his DNA. (ECF No. 29 at 24.)

During the trial, Detective Doser testified that he did not send any of the materials collected from Downs's motel room for a DNA test because he "[d]idn't see the need to." (ECF No. 31-10 at 143–44.) Downs told Detective Doser that "the ACE bandages were used to wrap [N.B.'s] hands so [N.B.] wouldn't pick his scabs." (*Id.* at 149.) Therefore, it would not have helped the investigation to test the ACE bandage given that "it wouldn't be unlikely that [N.B.'s] DNA would be on that ACE bandage." (*Id.* at 161.) Similarly, Downs told Detective Doser that he used the green rope to "play[ ] puppeteer with [N.B.]." (*Id.* at 162.) Given Downs's "explanation as to why [N.B.'s] DNA would be on" the green rope, Detective Doser found no need to test it. (*Id.* at 162–63.)

Because Downs gave Detective Doser an innocuous reason why N.B.'s DNA would be on the ACE bandage and green rope, testing those items for DNA would not have been fruitful. Consequently, Downs fails to demonstrate deficiency or prejudice. Ground 7d is not substantial, so Downs fails to demonstrate prejudice to overcome the procedural default. Ground 7d is dismissed.

**F. Ground 7e—failure to present a defense blaming Alamo**

In ground 7e, Downs alleges that his trial counsel failed to investigate and present a defense that Alamo was responsible for N.B.'s injuries. (ECF No. 29 at 25.) Downs explains that "to the extent [N.B.'s] bruising was the result of normal childhood activities based upon his nutritional deficiency or a side effect of his medication, Alamo's failure to provide for her child and adequately care for him was the actual cause of N.B.'s injuries." (ECF No. 68 at 18.)

As was the case with ground 7c, Downs's argument here is conclusory. *Jones*, 66 F.3d at 205; *James*, 24 F.3d at 26. Downs presents no evidence that N.B.'s injuries were merely the result of normal activities that were exacerbated by underlying issues. Making this argument without any support to back it up would have been nonsensical, so Downs fails to demonstrate deficiency or prejudice. Because Downs's claim here is not substantial, he fails to demonstrate prejudice to overcome the procedural default. Ground 7e is dismissed.

**G. Ground 8—failures during plea negotiations**

In ground 8, Downs alleges that his original trial counsel was ineffective for advising him to withdraw his plea. (ECF No. 29 at 26.) He argues that he was prejudiced by her deficient performance because the plea would have resulted in conviction of two counts of child abuse and a lower sentence (2 to 20 years for each count). (*Id.* at 27; *see also* ECF No. 30-21.) After withdrawing his plea, Downs was convicted at trial on all four counts charged and received a higher sentence (three concurrent terms of 96-to-240 months plus a consecutive sentence of life with the possibility of parole after 5 years).

Downs pleaded guilty under a plea agreement on January 9, 2014, to two counts of child abuse resulting in substantial bodily harm in return for the prosecution dismissing the third child abuse charge and the kidnapping charge. (*See* ECF No. 30-26 at 4.) Because the prosecutor had set a hard deadline for Downs to accept or reject the plea offer, Downs was put in the position of having

to choose between waiting to receive his expert medical report or losing the opportunity to enter into a beneficial plea bargain. Downs proceeded to plead guilty to two counts of child abuse causing mental injury. Down's trial counsel "promised [him] that she would withdraw [the] plea if the medical expert showed a biological reason for the marks [on N.B.] not pointing to abuse." (*Id.*) On April 1, 2014, Downs's trial counsel spoke with Godoy, who later testified as a defense expert at trial, and Godoy recommended that Downs withdraw "his plea as the marks did not corroborate the allegations." (*Id.* at 5.) Indeed, in her report issued a few days later, Godoy stated that the injuries were not necessarily due to abuse:

> Overall, the exam performed in the ER was minimal and they failed to rule out more severe diseases such as pertussis, hand food and mouth disease or medication reactions. The photographs are color copies and poor quality so an opinion as to the visual injuries is limited. Regardless, it is my opinion that there is evidence of medical processes that may account for some or most of the injuries described. In addition, the bruises are not highly suspicious for abuse and most of them are in locations that are consistent with normal or hyperactive play of a 7 year old boy with ADHD. I highly recommend further review of this case to determine the cause of his presenting symptoms.

(*Id.* at 12.)

Downs's trial counsel moved to withdraw Downs's plea. (ECF No. 30-26.) The trial court appointed Downs new counsel and held a hearing on Downs's motion. (ECF No. 30-30.) Downs testified that he had always maintained his innocence and only pleaded guilty based on his trial counsel's improper promise that his plea would be withdrawn if favorable evidence was obtained. (*Id.*) The trial court granted Downs's motion, stating that it was "gravely concerned about the cavalier attitude [Downs's original counsel] ha[d] demonstrated about her ethical obligations in this case and the obvious disregard she ha[d] demonstrated regarding the solemn nature of a plea canvass." (ECF No. 30-32 at 9.) Indeed, the trial court found it troublesome that Downs's original counsel promised Downs that he would be able to withdraw his plea when such a promise was highly

inaccurate given that the decision of whether a withdrawal of a guilty plea should occur rests solely with the trial court. *See Stevenson v. State*, 354 P.3d 1277 (Nev. 2015). The trial court then stated that if it "were to allow [Downs's] guilty pleas to stand under the facts of this case there is no doubt that the Nevada Supreme Court would correctly remand the matter . . . and direct that [Downs's] request be granted and a trial be conducted." (ECF No. 30-32 at 10.) Because it could not be reasonably disputed that Downs pleaded guilty based on his trial counsel's misguided promise, the trial court opined that the Nevada Supreme Court would certainly agree that Downs's guilty plea was not knowingly made. Thus, the trial court found it prudent to grant the motion to withdraw the plea rather than making the parties wait years for the appellate court to inevitably reverse Downs's conviction on direct appeal, prejudicing the parties by the passage of time.

"[D]efense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Missouri v. Frye*, 566 U.S. 134, 143 (2012) (explaining that "the negotiation of a plea bargain . . . is almost always the critical point for a defendant"). "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler v. Cooper*, 566 U.S. 156, 168 (2012). "The defendant, though, has 'the ultimate authority' to determine 'whether to plead guilty.'" *Clark v. Chappell*, 936 F.3d 944, 968 (9th Cir. 2019) (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). Counsel's role then is to "advis[e] a client about a plea offer and an ensuing guilty plea" and give "legal aid and advice [to] help" the client make their determination. *Frye*, 566 U.S. at 140.

Downs argues that his original counsel failed to meet these responsibilities surrounding his plea because counsel exposed him to multiple convictions and longer sentences by advising him to withdraw his guilty plea. Specifically, Downs argues that while Godoy's report cast doubt on whether N.B.'s injuries were due

to abuse, it failed to undermine the factual basis for the first-degree kidnapping charge, so his original trial counsel had no convincing basis to advise him to withdraw his plea. (ECF No. 68 at 23.) The Court acknowledges that Downs's plea bargain would have resulted in a more beneficial sentence. However, the issue here is not simply based on the sufficiency of Godoy's report, as a whole host of factors go into a decision of whether a defendant should plead guilty or go to trial. In fact, here Downs steadfastly maintained his innocence of the charges, Downs was hesitant to enter his guilty plea in the first place, and Godoy's report was at least somewhat beneficial to Downs's defense. Given these factors and the weighing of the various risks that go into deciding to plead guilty or go to trial, it cannot be determined (based solely on Godoy's report) that Downs's original trial counsel's advice to withdraw his guilty plea was deficient under *Frye*.

Turning to the prejudice prong, even if Downs's trial counsel had not advised him to file the motion to withdraw his guilty plea, it appears from the record that Downs would have still challenged his guilty plea in the form of a direct appeal. Indeed, at the evidentiary hearing, Downs testified that it was his intention to withdraw his plea. (ECF No. 30-30.) As the trial court reasonably noted, Downs's original counsel made improper promises to him, rendering his plea invalid. Accordingly, regardless of whether Downs's trial counsel filed the motion to withdraw his plea before sentencing, the plea would still have been vacated following the appellate court's inevitable finding that the plea was invalid from inception. Thus, the ultimate result of the proceedings would not have been different: either the trial court granted the motion to withdraw the plea filed by Downs's counsel or the appellate court granted Downs's direct appeal challenging the validity of his guilty plea.

Because ground 8 is not substantial, Downs fails to demonstrate prejudice to overcome the procedural default. Ground 8 is dismissed.

### H. Ground 9—failure to move to suppress statements and recording

In ground 9, Downs alleges that his trial counsel failed to move to suppress statements that he made to Detective Doser and object to the admission of the interrogation videos at trial. (ECF No. 29 at 28.) Specifically, Downs alleges that, given the totality of the circumstances of both interviews, he was not free to leave the second interview and should have been given a *Miranda* warning by Detective Doser. (*Id.* at 29.)

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

"[T]he ultimate inquiry" of whether someone is in custody "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); *see Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (holding that "persons temporarily detained pursuant to [ordinary traffic] stops are not 'in custody' for the purposes of *Miranda*"). There are "[t]wo discrete inquiries" to determine whether an individual is in custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Relevant factors in ascertaining how an individual would assess his

freedom of movement "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted). The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

The Court has watched Downs's two police interviews (*see* ECF No. 69), and it is clear he was not in custody during his first police interview. Downs voluntarily came to the police station, Detective Doser told Downs at the beginning of the interview that he was not under arrest, the interview only lasted an hour, the interview was not confrontational, Downs said that he would stay there all night when Detective Doser indicated that he was almost done with his questions, and Downs was not arrested at end of the interview. The second interview is less clear. On the one hand, Downs again voluntarily came to the police station, Detective Doser again told Downs that he was not under arrest and to let him know when Downs wanted to be done talking, and the interview only lasted an hour. On the other hand, Detective Doser was more confrontational during the second interview, recited Downs's rights under *Miranda* towards the end of the interview, and arrested Downs.

Even if Downs's trial counsel acted deficiently in not moving to suppress the second police interview due to the failure to give Downs his *Miranda* warning earlier in the interview, Downs fails to demonstrate prejudice. During his interviews, Downs was adamant that he would never have intentionally hurt N.B., explaining that he had only inflicted minor, accidental injuries on N.B. and only "maybe" could have done "something stupid" while intoxicated. The lack of a confession (or any type of unambiguous disclosure for that matter) negates a

finding that Downs can meet his burden of demonstrating that there is a reasonable probability that, but for his trial counsel's failure to file a suppression motion, the result of his trial would have been different. This conclusion that Downs fails to establish prejudice is bolstered by the overwhelming evidence of his guilt, including N.B.'s and Dr. Wagoner's testimonies.

Because ground 9 is not substantial, Downs fails to demonstrate prejudice to overcome the procedural default. Ground 9 is dismissed.

## IV. CERTIFICATE OF APPEALABILITY

This is a final order adverse to Downs. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a Certificate of Appealability. The Court has *sua sponte* evaluated the claims within the First-Amended Petition for suitability for the issuance of a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a Certificate of Appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a Certificate of Appealability is appropriate only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the Court's procedural ruling was correct. *Id*. Applying these standards, the Court finds that a Certificate of Appealability is unwarranted.

## V. CONCLUSION

It is therefore ordered that the First-Amended § 2254 Petition [ECF No. 29] is denied.

It is further ordered that a Certificate of Appealability is denied.

It is further kindly ordered that the Clerk of Court (1) substitute Nethanjah Breitenbach for Respondent State of Nevada, (2) enter judgment, and (3) close this case.

DATED THIS 29th day of September 2026.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE